If candor and credibility is the full sway here today, in 10 minutes the government is going to stand up here and admit to the court that what they are advocating is an expansive, indeed some would say radical, departure from existing Fourth Amendment jurisprudence. And, indeed, the government is asking this court to engage in that endeavor without providing much guidance. And I don't want to belittle the government's briefings here, but it's not at all clear to me what their theory is for why this recorded conversation engendered a complete distinguishment of Monghur's Fourth Amendment rights. And there is no case, of course. Alito They're basically trying to extend the principle in the Seventh Circuit case, Judge Posner's opinion, are they not? Brandon Monghur In Cardona Rivera. Alito Yeah. Brandon Monghur And I agree with Your Honor that I think that that is their most viable theory. And, of course, the government has never briefed it or talked about it. In fact, I did because I felt like I had to. But that is probably the most viable theory that they have here, is that in the Seventh Circuit is the only circuit that I know of that has embraced this theory. And that theory being — Alito How would you distinguish that case from this case? Brandon Monghur Well, in that — and Judge Posner made pains to talk about how, in that case, that the disclosure to law enforcement was — first distinguishing facet is it was directly to law enforcement, with law enforcement officers standing right in front of the individual. The second distinguishing facet is that it clearly and unequivocally stated what was in the package. Indeed, in Cardona Rivera, it was a package in the briefcase that looked suspiciously like packaged cocaine. The officers asked what was in the briefcase, and the individual said coke. Now, there's some dispute over whether he really said it, but the court accepted that — the law enforcement's assertion on that. And so Posner said that if you — that that was the equivalent of opening up the package and pointing to it. That here we have a direct, clear, unequivocal statement that this is what is in my package. And I suppose that that makes some sense, that it's a — once again, it's, I guess, a hybrid of the — or an extension of the plain view doctrine, that if you're willing to explain to a law enforcement officer right in front of you exactly what you have in the package, then perhaps you do lose an expectation of privacy. But I will note that other circuits do not embrace that doctrine. In fact, the Fifth Circuit has specifically disavowed the verbal disclosure doctrine in Villarreal. Now, the Fifth Circuit left open the possibility that an extension of single-purpose cocaine or — Fifth through the seventh. Well, I'm sorry, Your Honor. The Fifth Circuit in Villarreal disclaimed that verbal disclosure doctrine. They said that we do not embrace that, that an individual has every right to tell law enforcement what's in a package and still stand on their Fourth Amendment rights, which they say explicitly. Mr. Carr, let me ask you another question. Would you concede that probable cause existed to support the issuance of a warrant had the agents taken the time to obtain one? Your Honor, I would not concede that point. I think it's a close case for probable cause. What I would concede is that the government had every ability and, in fact, had an obligation to take this information that they learned through the monitored telephone conversation and use it to apply for a warrant. In fact, I believe that if you look at Miller — You're not conceding they had PC, but they had time to get a warrant. They had time to get a warrant, and they may have been able to get it. And, in fact, I would concede that they could have used this information to try to get a warrant, definitely. There's no real credible argument under precedent as it exists now that they couldn't use the information in that recorded conversation. You're arguing for reversal of the denial of the suppression? The argument is, Your Honor, it's very simple. It's a warrantless search that does not follow. That's what your argument is. I'm sorry. What's the result you're asking us to reach? I'm asking that the district court's order that the motion, our motion to suppress, be denied, be reversed, and the motion to suppress be granted. Why shouldn't we remand for the district court to consider Herring? Herring. In what context, I'm sorry, Your Honor? Well, Herring is the recent U.S. Supreme Court case that says that suppression is not in every Fourth Amendment violation. Suppression is not necessarily an automatic remedy. Yes, Your Honor. In Michigan v. Hudson, another recent Supreme Court case, they said the same thing in regard to the knock-and-announce rule, that there are the – the Supreme Court does seem to be truncating some outlying areas of the Fourth Amendment where the rule of suppression would apply. But here we're talking about a core constitutional protection, and the case law is well The peripheral Fourth Amendment issues are where I believe there's some litigation action, at least from the Supreme Court. I don't understand that answer at all. You're trying to draw a distinction between the seriousness of the Fourth Amendment issue at play? I believe the Supreme Court does that, actually. In the Michigan case – I'm not as familiar with Herring, unfortunately, but the Michigan v. Hudson case, the Supreme Court gets – directly gets into what is the Fourth Amendment right that's been violated, what was the police action that caused the violation, and what prophylactic function could be served by applying the exclusionary rule in that context. In this case, I expect we're going to hear the prosecution argue that the agents were concerned that there were five children in the house, and they thought that there might be an unsecured weapon. And they also knew that your client's friend – or suspected that your client's friend was en route to that location. So to get back to Judge Hawkins' question, if the agents were pure of heart, they were trying to protect the children from the presence of the weapon, why should we invoke the remedy of suppression in this case? Well, I guess there are two questions there. The first is that under any kind of exegete circumstance argument, the government fails in that endeavor because the law is clear that if you have time to secure a warrant, you should do so. Secondly, what they could have done immediately – and this record here discloses they did not act immediately. They waited like a day or so before they wandered over there. But they could have seized the container and taken it out of the residence and then secured a warrant, and that would have alleviated any of those concerns. And this is an easy question to answer here. What should the officers have done? There are a number of things that they should have done here to comport with the Fourth Amendment but didn't. They had plenty of time to get a warrant. They listened to these conversations. The conversations they made on the 9th, they listened to them on the 10th. They could have gotten a warrant within an hour and gotten this container. They could have gone to the house and seized the container. You're saying they could have gotten a warrant within an hour? They do it routinely. Metro does. Within an hour? Warrants. Within an hour? Well, that may be a little bit of a – That would be the shortest time in my experience, and I've obtained a lot of warrants in my prior life. Yeah. Your Honor, you're right. I have a little bit of hyperbole there. In a short period of time, they could have secured the warrant. And they could have secured the container. There are a couple of things that, although we're casting about for a theory here, but if we're going to look at the verbal disclosure theory, I think it's important to note in the excerpt of the conversation here, the monitored conversations are contained on pages 33 and 35 of the record. The important thing to note is that Mr. Monger does not initiate any of these conversations about the thing. And, of course, the thing is far cry from the direct and unequivocal exposure of the contents of the container that they talked about, that the Court talked about in Cadorna-Rivera. But don't we have to give some deference to the experience of agents who are investigating gangs, drugs, and violence that they speak the language that we judges do not? Yeah, absolutely. Actually, in this particular circumstance, Your Honor, you do not. In fact, Gus talks about how in the application of the single-use container, and Gus also talks a little bit about the verbal disclosure, although they talked about how that wasn't brought up, that in this context, you cannot rely upon law enforcement experience. Gus, the Ninth Circuit case from 2005, you have to evaluate. To interpret the code words? Yes. Using on the telephone? Why not? Well, that's if you extend single-purpose container doctrine because there is no case law directly on point here. I think you and I are talking about two different things. I'm asking you about what deference we should give an FBI agent who listens to your client using code words on a jail telephone and concludes based on his training and experience that what your client's really talking about is a gun that's hidden in a container in the apartment, and he's telling his friend to go get it before the police find it. Well, Gus, and I talked about this in my reply brief, Gus says no, that you have to use the lay person's interpretation of the doctrine. And in this case, if they're using single-purpose container, it talks about the physical configuration of the container. But if they're going to use that doctrine to extend it to a monitored conversation, what Gus says is that the container has to be obvious to the average person, not taken into account, and they talk about this explicitly, law enforcement experience with containers and experience with drug trafficking and such. And I see I only have 40 minutes left, so I'd like to reserve that if I may. You bet. Thank you for your argument. A letter from the government at this time. Maybe there ought to be a requirement, counsel, that Article III judges watch Season 1 and 2 of The Wire. Counsel? Good morning, Your Honor, and may it please the Court. Robert Ellman for the United States. I believe that the issue here is both narrower. Can you speak up? I beg your pardon? Can you speak up? Oh, yes, Your Honor. I'm sorry. I believe that the issue here is both narrower and simpler than what it has been portrayed as by appellant's counsel. The issue is not the legality in the first instance of the search. It's not whether a warrantless search is justified in this instance.  It doesn't turn on the seriousness. How did he abandon that? He didn't say anything about a gun. He didn't say where a gun was. He used a code word that was interpreted by the police to be that. But would that be an abandonment? It would, Your Honor. You're addressing the privacy by slang argument that the defendant has made, which, as we note in the answering brief, was rejected by the Second Circuit in Freedman, where they say that cryptic language is not sufficient to preserve privacy. Perhaps more importantly, when you're dealing with the legitimacy of a defendant's expectation of privacy, for purposes of suppression, there's a two-pronged analysis. The defendant may intend, through his cryptic language, to preserve the secrecy of those contents, but that's merely the subjective prong. The defendant also has to establish that that expectation is one that society is prepared to accept. And, of course, it is not, and that's what Freedman says, and that's what other cases say as well. And I'd like to refer the Court to a First Circuit case called the United States v. Scott. The citation is 975 F. Second 927 at page 930. And I'd like to quote the Scott court. They said Is this in your brief? It is not, Your Honor. What's the date of the decision? 1992. When did you find it? I found it Saturday. When you finish with your argument, will you fill out a sheet with the courtroom deputy? I certainly will, Your Honor. Provide a copy to your counsel, to your opposing counsel. And I will give the defendant, the panel will give the defendant an opportunity to respond to your citation of this case in writing, if he chooses. Very well, Your Honor. And I apologize for not finding the case earlier. Well, if you found it on Saturday, you had time to call your opponent, right? That's correct, Your Honor. Okay. Courtesy would suggest that you do that in the future. Go ahead. Again, I apologize both to the Court and to the jury. No apologies are necessary. We just expect you to act professionally. I will do that, Your Honor, in the future. I just have a question about the scott court, et cetera. What the scott court says is, quote, what we have here is a failed attempt at secrecy by reason of underestimation of police resourcefulness, not invasion of constitutionally protected privacy, end quote. And that's all I was looking for out of the scott decision. When a defendant uses street vernacular, it is akin to him using a foreign language. Some people may be familiar with it and others may not. If, for example, the defendant had been speaking Spanish and used the word mesa, saying, for example, I have contraband hidden under the mesa. If the interpreter then told police that mesa meant table in English, that would not really be the translator's subjective understanding. The term mesa has an objective meaning in English, which is table. Likewise, the term thing, according to the testimony of agent McKamey at page 77 of the excerpts, means gun in street vernacular. Because the defendant has failed to establish, to carry his burden to establish that his expectation of privacy was objectively reasonable, he lacks the standing he needs to move to suppress this evidence. Did the agents have time to attempt to secure a warrant? I don't know whether they did or not, Your Honor. How long did they wait between the receipt of the information and the search? It appears that they acted virtually immediately. And I'd like to address a statement. That's an interesting description. It was more like a day, wasn't it? No, that's actually not correct, Your Honor. The tapes were not reviewed on the day that the statement was made. The tapes weren't reviewed until the next day, which was May 10th. Okay. What time did they review the tapes? I believe it was in the afternoon, if I'm recalling correctly. And what time did they search? It was sometime shortly after 5 p.m. is the best evidence we have on that. I thought the agent's testimony was he started reviewing the tapes at around 5 p.m. because he was working a later shift. Your memory may be correct, Your Honor. My memory is what the record shows, Mr. Allman. I believe the relevant testimony on that issue is in the excerpts at approximately pages 77 to 80. And I think page 80 is what you're talking about. And my notes tell me it was after 5 o'clock when Agent McKamey listened to the tapes.  So you're correct, Your Honor. So he's working a late shift. He starts listening to the jail tapes at about 5 o'clock. And when does the search occur? They arrive at the house around 6.41 p.m. And I refer you again to page 80 of the excerpts. In any event, Your Honor, I want to emphasize that what we're not arguing here, we're not arguing the legality of the search in the first instance. The ability to get a warrant wouldn't matter if the defendant lacks the standing here. An unlawful warrantless search bears no remedy for a defendant who lacks an expectation of privacy under the RACIS line of cases. And that's our only argument on this. In order to abandon a privacy right, does it require an intent on the part of the person? No, I don't believe so, Your Honor, because the cases say that revelation of this information to a third party would still be sufficient to abandon the interest. And I believe that the case law even involves a disclosure to a bank where the defendant thought the bank would maintain the privacy interest. And that was deemed sufficient to waive the privacy interest. And, again, that would only go to the defendant's subjective expectation of privacy in any event, Your Honor. The case I think I'm referring to here, if I'm recalling correctly, is Katz, where they say that revelation to third parties is sufficient. As far as the Gust case from this Court is concerned, it doesn't further the defendant's argument because the defendant has overlooked footnote 14 at page 804 of the Gust decision. And in that footnote, the Gust court states ---- Footnote 14 at what page? Page 804. Thank you. And, specifically, the court says that it expresses no opinion whether Gust's pre-search admissions to the police that the cases contained guns should be relevant to determining whether Gust retained any expectation of privacy in the gun case as neither party raised this issue on appeal. If you look at the beginning of the Gust decision at page 798, they mention that the defendant tells police there's a gun in the case. That fact never reappears in the analysis until footnote 14. So Gust does not answer this question. Cardona Rivera does answer this question and says that this amounts to a sufficient abandonment of a privacy interest. There's a distinction here between suppressing evidence and determining whether a search is lawful or not. Attacks on consent and probable cause cannot overcome the lack of a privacy interest. Likewise, in Villarreal, in footnote 3, the court states that it is not addressing an issue that the defendant is citing Villarreal for. And that's what I – that's part of the reason I cited the LaFave Treatise to the court, Your Honor. So, Mr. Elman, your position is, adopting Judge Posner's theory, that it doesn't matter that the officer was not in the immediate presence of the defendant since the defendant knew he was on a monitored phone. That's the equivalent of speaking to the police officer directly. It is, Your Honor. Defendants tried to draw two distinctions between this case and Gust. One is direct revelation to police versus indirect. And the other is staleness. Well, he's wrong when it comes to direct or indirect for two reasons. First of all, it's actually directly revealed to police here because he is aware from the express warning that the statements he makes are subject to monitoring and recording by police. And that's both written and audible, as I understand it? It's written on a sign above the telephone. And if you look at the testimony in pages 149 and 150 of the excerpts, they talk about the oral warning that's given. But the agent could not swear that the caller heard that warning, only the recipient. So I can't rest on that fact. In any event, the court did find that he was aware. It's also irrelevant because the defendant has no legitimate privacy interest in information revealed to third parties. And I'd cite the Court to the U.S. Supreme Court line of cases there, which includes Smith v. Maryland. The timeliness aspect of it is wrong because staleness goes only to probable cause. It has nothing to do with the expectation of privacy that he's abandoned in these statements that he makes to his confederate. Is your red light on? I beg your pardon? Is your red light on? Yes, it is, Your Honor. That means stop. Thank you. Thank you. I appreciate you coming in today. Rebuttal. This pleads me, Your Honors, that it's important, I suppose, to recognize that this is not a disclosure directly to law enforcement. This is a calls are monitored by the jail, and jail is not equal law enforcement. In fact, it is a little different in the sense that he's warned that the conversations are being monitored, and I don't think you're challenging the fact that he knew that the calls could be listened to by folks at the jail. New York should have known. And you're not challenging that he knew that when he made the call. The question is what's the significance of notwithstanding that warning, going ahead and taking the chance that by speaking in coded words the police won't be able to figure out what he's talking about. It just distinguishes this case from Cardona-Rivera because there are degrees of How do you, I mean, how do you distinguish that? Well, there's certainly, in my mind, and perhaps on the Court's mind, there's a big distinction between making a telephone conversation, having a conversation with your friend, which, incidentally, monitor never instigates any of this conversation, and that's significant, too. He never mentions the gun. It's always loosely. There's no question. So it's a third-person waiver here in this situation. There's no question that if he were talking to his friend on a phone that happened to be the subject of a Title III wiretap, he could still claim he had a reasonable expectation of privacy because he didn't know that the police were monitoring the call. But here, there's no question that others are going to listen to what he says, and he knows that at the time he's making the statement. But does it matter who is listening? I'll draw an analogy to ex post facto law, which supposes a defendant who actually knows the law, and if you look at the law regarding recording of conversations, the rationale for it is for jail personnel can conduct jail security. That is the reason why they're allowed to monitor the conversations. So the enlightened defendant would know. So are you arguing for a rule that the only thing that is protected or that could be used would be conversations directly relating to a threat to jail security? Well, I would argue that he would not, that the use, the derivative use of that conversation would be more clear. But the real argument I'm making here is that it is a distinction, a significant distinction from making the statement directly to a law enforcement officer in your presence. And I see my time is far up. It is. I don't see any other questions. The case just argued will be submitted. Thank you both for coming in today.
judges: Hug, Hawkins, Tallman